[Crim. No. 3468. Second Dist., Div. One. June 10, 1942.]

THE PEOPLE, Respondent, v. BINGHAM GRAY, Appellant.

624

Joseph Scott and Byron C. Hanna for Appellant.

Earl Warren, Attorney General, Eugene M. Elson, Deputy Attorney General, John F. Dockweiler, District Attorney, and Jere J. Sullivan and Fred Henderson, Deputies District Attorney, for Respondent.

DESMOND, J. pro tem.—The appellant was accused, in a grand jury indictment, of soliciting a Mrs. Trew to commit perjury on three different occasions, February 2, 1939, March 1, 1940, and March 20, 1940. He was tried by a jury and found guilty of the first two of these charges under counts I and V of the indictment and not guilty of the third charge, set up in count VII. He was accused in the same indictment of soliciting George Trew to commit perjury on two occasions, March 1, 1940, and March 20, 1940, (counts VI and IX). As to these charges he was found guilty of the first; not guilty of the second. The jury found appellant guilty of additional offenses as follows: Under count II, attempted subornation of perjury committed on February 16, 1939, in his dealings with Mrs. Trew; under count VIII, subornation of perjury committed on March 20, 1940, in relation to Mrs. Trew; under count X, the same character of offense committed on March

20, 1940, in connection with Mr. Trew; under count XII, soliciting George Gallina on May 22, 1940, to commit perjury. He was acquitted under count XI and count XIII of bribing Gallina as that offense is defined in section 137, Penal Code.

He appeals from all judgments of conviction and from the order of the trial court denying his motion for a new trial upon each and all of the counts upon which the jury found him guilty. As grounds for his appeal he claims insufficiency of the evidence to sustain conviction upon any of such counts, errors of the court in sustaining and in overruling certain specified objections to the admission of evidence. He also claims that the district attorney was guilty of misconduct warranting the setting aside of all the judgments of conviction, specifying many instances of alleged misconduct, and he charges that the court committed serious error in giving and refusing certain instructions; also, in modifying instructions and permitting the jury to have the instructions with such modifications appearing thereon.

The reporter's transcript of the evidence has been carefully examined. It consists of approximately 2,500 pages and reveals that appellant was indicted upon eighteen counts, the last three of which were dismissed at the trial upon motion of the district attorney. As to another count the jury was directed by the court, upon the district attorney's motion, to render a verdict of not guilty, similar action being taken in regard to still another count, upon motion of appellant's counsel. On six counts, the jury rendered a verdict of not guilty. The three counts which the district attorney moved to dismiss involved alleged soliciting by appellant of one Carolyn Galbraith to commit perjury, subornation of perjury in connection with the same person, also bribing her as a witness, as defined in section 137, Penal Code. Two of the counts upon which the jury acquitted appellant charged him respectively with soliciting one Vincent Herron to commit perjury and with bribery of said Herron, under said section 137. Summarizing, it will be seen that at the conclusion of his trial appellant stood convicted of six criminal offenses arising from his dealings with Mr. and Mrs. Trew, the other remaining conviction arising from his dealings with George Gallina. The two convictions based upon his soliciting perjurious statements from Mrs. Trew, as well as two similar convictions arising from his transactions with George Trew and George Gallina, were charged as violations of section 653f,

Penal Code, which provides punishment for every person who solicits another to commit or join in the commission of various listed crimes including perjury. The two counts under which he was found guilty of subornation of Mr. and Mrs. Trew respectively as well as count II under which he was found guilty of an attempt were set up under section 127 of the Penal Code which reads as follows:

"*Subornation of Perjury.* Every person who willfully procures another person to commit perjury is guilty of subornation of perjury, and is punishable in the same manner as he would be if personally guilty of the perjury so procured."

The counts in which Mr. and Mrs. Trew were concerned all had to do, directly or indirectly, with a lawsuit filed by appellant as Mrs. Trew's attorney and with investigations by State Bar authorities as to the manner in which the case was handled. The suit arose from a traffic accident which occurred on September 19, 1938, in which Mrs. Trew claimed she was injured and for which she sought damages in the sum of $25,000. The specifications of injury and damage set up in a complaint filed by this appellant in behalf of Mrs. Trew on October 10, 1938, against the Los Angeles Railway Corporation, read as follows:

## "III.

"That by reason of the negligence of the defendant as aforesaid, the plaintiff, Patricia Trew, was bruised and injured about her body and person, and was severely injured in her health, strength and activity, and was made sick and sore thereby; that she received a severe nervous shock; that said plaintiff has suffered thereby, and still continues to suffer, great pain and mental anguish; that by reason of the foregoing injuries the plaintiff has suffered damages in the sum of Twenty-five Thousand Dollars ($25,000.00).

## "IV.

"That by reason of the injuries as aforesaid, the plaintiff, Patricia Trew, was compelled to receive medical care and treatment; that plaintiff is obligated to pay for said services, and upon information and belief alleges that it will be necessary to secure additional medical services in the future, and to have X-rays taken; that said plaintiff does not know at this time the amounts due and to become due for said services rendered and to be rendered; that said plaintiff will

ask leave of this Court to amend this complaint to state said amounts when they are ascertained.''

This action was settled approximately four months later by the corporation's paying to appellant, as Mrs. Trew's attorney, the sum of $6,000. This may cause surprise when it is noted that Mrs. Trew suffered no broken bones, sprains or even the slightest scar, whose injuries as detailed to the jury in this case, by the doctor who attended her and who was engaged upon the recommendation of this appellant, were a bump on the back of the head, some scattered bruises on the back and chest, a definite muscular spasm over the sacroiliac joint and bruises on the knees. The doctor ordered her to stay in bed for three weeks and during that period called on her ten times and ten or fifteen times during the next 3½ months. He stated that he gave her sedative pills the first time he attended her and told her to put an ice-pack on her head; that five days later he strapped her back and possibly again at a later time. He also stated that he gave Mrs. Trew one or possibly two heat treatments; that she had no fracture but complained of pain in back. ''I felt she had a sacroiliac sprain,'' but no X-rays were taken of her back. In determining whether to give credence to this testimony by the physician, itemizing Mrs. Trew's bruises, the jury, of course, had a right to consider the testimony of the motorman describing what happened at the time of the accident. He testified that his car struck Mrs. Trew's automobile; that it was quite a heavy jar which knocked the automobile a few feet; ''She had stopped suddenly in front of me and just had started up''; that the impact knocked her car four or five feet but not against the curb at the southwest corner; ''She pulled the car over after the impact; she pulled it around the corner. She was just starting up when the accident happened, why, she had the car in gear, and she ran over and stopped; she was making a left turn.'' According to this witness he went over to the auto and talked with Mrs. Trew, who got out of the auto. He also testified that a lady got off the car at the same time and went over to the auto; that Mrs. Trew talked to her and came back and got on the car, tried to get some witnesses; was around there after the accident five or six minutes; that she appeared to be perfectly conscious and seemed to know what she was talking about.

The settlement for $6,000 followed, by only a few days, the taking of the plaintiff's deposition on February 16, 1939,

before H. D. Palmer, a notary public. As to this proceeding count I of the indictment charged ''That on or about February 2, 1939, the said defendant Bingham Gray, then and there knowing that said deposition was to be taken on or about February 16, 1939, and then and there knowing that said plaintiff, Natalie Patricia Trew, was to be a witness before the said H. D. Palmer, notary public, as aforesaid, and then and there knowing that the said Natalie Patricia Trew, plaintiff in said civil action, was to be duly and regularly sworn to testify to the truth, the whole truth and nothing but the truth with respect to said material matters at the taking of said deposition, said defendant, Bingham Gray, did knowingly, willfully, unlawfully and corruptly solicit and instruct the said Natalie Patricia Trew to willfully, knowingly, falsely and perjuriously testify, swear and state as a witness in the giving and taking of her said deposition in substance, as follows: That she, the said Natalie Patricia Trew, was rendered unconscious by said accident; that when she regained consciousness a woman and the motorman of the street car involved in the accident came over to her, the said Natalie Patricia Trew; and that she, the said Natalie Patricia Trew remembered nothing more until she came to in , her bed at her home with a doctor bending over her; and that said doctor, to wit, one Saul Moss, was her family doctor and her aunt's physician; and that she was not, by her testimony, to connect the said Moss and the said defendant, Bingham Gray, together; and that she was to and should testify that since said accident, she had been wholly incapacitated from performing any work of any sort; that she did not want to leave her house because when she did leave, such leaving made her feel bad; that she had had several fainting spells since the accident and that she was melancholy and that the world was against her and that her husband and her mother who should be close to her, had turned against her; and that she should exaggerate in other respects the extent of her injuries and the suffering and pain caused therefrom; and that she had had constant headaches and frequent dizzy spells ever since that accident; the said defendant, Bingham Gray, stating to said Natalie Patricia Trew that such false and perjurious testimony would make her case stronger and enable him to secure more money for her on account of said alleged injuries.

''That in truth and in fact, to the knowledge of the said

defendant, Bingham Gray, the said testimony so solicited and directed by said defendant, Bingham Gray, was false in the following particulars: That the said Natalie Patricia Trew did have a clear and distinct recollection of all of the events following such accident occurring on the day thereof; that in truth and in fact, the said Natalie Patricia Trew had, following said accident, driven her automobile to a place where she had picked up her mother, had then taken her mother home, had then gone and gotten her husband and proceeded home with him and had continued and remained fully conscious of all events following said accident on the day thereof; that in truth and in fact, said Dr. Moss was not the family doctor of said Natalie Patricia Trew nor was he nor had he ever been her aunt's physician, but in truth and in fact, said doctor was a doctor called at the suggestion of the defendant, Bingham Gray; that in truth and in fact, said Natalie Patricia Trew remained in her home from the date of said accident, to wit, on or about September 18, 1938, until on or about January 15, 1939, except for occasional absences therefrom, at the direction and suggestion of said Bingham Gray who on several occasions instructed her to remain in her home in order to build up the claim for damages in said action;

"That in truth and in fact, said Natalie Patricia Trew did wish to leave her home and was not rendered worse nor did she feel bad after being absent therefrom; that in truth and in fact, said Natalie Patricia Trew had not had several or any fainting spells since said accident nor was she melancholy nor did she feel that the world had turned against her nor did she believe or feel that her husband or mother had turned against her nor had she had constant headaches or frequent or any dizzy spells; that in truth and in fact, she had not been wholly incapacitated from performing any work since said accident;

"That in truth and in fact, the said defendant, Bingham Gray, well knew the falsity and perjury of said statements and testimony which were so solicited and directed by him to be made by said Natalie Patricia Trew under oath at the taking of said deposition."

Count II of the indictment, accusing the appellant of subornation of perjury committed on February 16, 1939, charged that on that date said crime occurred, when Mrs. Trew's deposition was taken; that the perjurious statements and representations which had been solicited by appellant

were actually sworn to as true, Mrs. Trew thereby committing willful and corrupt perjury and being procured to do so by the defendant, Bingham Gray. Under this count appellant was found guilty of attempted subornation of perjury, "a lesser offense than that charged in count 2 of the indictment but necessarily included therein."

More than a year after Mrs. Trew's lawsuit was settled, and on March 20, 1940, appellant's conduct in connection with the case was inquired into, count V of the indictment charging that in connection with that investigation appellant again and on or about March 1, 1940, solicited Mrs. Trew to commit perjury, that "there was pending before The State Bar Special Local Administrative Committee number 1, a duly and regularly appointed and acting committee of the State Bar of the State of California, an inquiry into a charge and charges of unethical and improper conduct of said defendant, Bingham Gray, who was at all times in this count mentioned, an attorney-at-law duly and regularly licensed to practice law in the State of California, and member of said State Bar. . . . that in said inquiry before said Committee, it was material to know how much money had been paid to said Natalie Patricia Trew and had been received by her out of the total sum of Six Thousand and no/100 Dollars ($6,000.00) paid by said Los Angeles Railway Corporation, a corporation, in the settlement of said action, and it was also material to know in what manner one Dr. Saul Moss became the physician for said Natalie Patricia Trew and it was material to know the manner in which the accident occurred as a result of which Natalie Patricia Trew brought suit against the Los Angeles Railway Corporation, a corporation, in case numbered 432819, the nature and extent of her injuries in connection with said accident, and all matters and things surrounding the cause of action of the said Natalie Patricia Trew in said case.

"That the said defendant, Bingham Gray, well knowing the said Natalie Patricia Trew would be a witness in said proceedings before said Committee and well knowing that as such witness, said Natalie Patricia Trew would be sworn to testify to the truth, the whole truth and nothing but the truth, and well knowing that said Natalie Patricia Trew had received the sum of One Thousand One Hundred Fifty and no/100 Dollars ($1150.00) and no more out of said settlement of Six Thousand and no/100 Dollars ($6,000.00) as aforesaid, and well knowing that said Dr. Saul Moss was not nor never

had been the family physician of said Natalie Patricia Trew, and was not nor never had been the physician of the aunt or any aunt of said Natalie Patricia Trew, and well knowing that the said Natalie Patricia Trew had exaggerated and committed perjury in connection with the deposition theretofore taken on or about February 16, 1939, in her case against the Los Angeles Railway Corporation, a corporation, case numbered 432819, and that said Natalie Patricia Trew had falsely in said deposition stated that she did not remember how she got home after the accident and that when she came to after arriving at home, the doctor was leaning over her and working on her and that at the time of the taking of the deposition, heretofore mentioned, the pain in her head seemed to get worse instead of better and that she had pains in her head that shoot down her neck all the time and that after the accident and at the time of the taking of the deposition, she did not want to leave her house because she felt worse when she returned, the said defendant, Bingham Gray, did knowingly, willfully, unlawfully and corruptly solicit and instruct the said Natalie Patricia Trew to willfully, knowingly, falsely and perjuriously testify, swear and state as a witness under oath before said Committee, in substance as follows:

''That she, the said Natalie Patricia Trew, had received Twenty Seven Hundred and no/100 Dollars ($2700.00) out of said settlement aforesaid, and that the said Dr. Saul Moss was the family physician and the physician of an aunt of said Natalie Patricia Trew, and that the said Natalie Patricia Trew did not know and remember how she got home after the accident and did not know that she drove her automobile home thereafter and that the said Natalie Patricia Trew did not come to until the doctor was leaning over her and working on her after arriving home after the accident and that at the time of the taking of the deposition, the pain in the head of said Natalie Patricia Trew seemed to get worse instead of better and that she had pains in her head that shoot down her back all the time and that she felt worse after being out of her home and upon her return to her home.

''That in truth and in fact, the said defendant, Bingham Gray, well knew the falsity and perjury of said statements and testimony which were so solicited and directed by him to be made by said Natalie Patricia Trew under oath to the aforesaid Committee.''

Count VI of the indictment charged appellant with soliciting on or about March 1, 1940, George Trew, the husband of Natalie Patricia Trew, to commit perjury in connection with the same matters mentioned in Count V in connection with Mrs. Trew's perjury.

Count VIII accused appellant of subornation of perjury in "That on or about the 20th day of March, 1940, the defendant, Bingham Gray, did willfully, knowingly and corruptly procure, induce and instigate one Natalie Patricia Trew to commit the crime of Perjury; that the said perjury of the said Natalie Patricia Trew so procured by the defendant, Bingham Gray, was committed as follows: . . .

"That in connection with and in the course of the aforesaid proceeding and inquiry by the said State Bar Special Local Administrative Committee number 1, the said Natalie Patricia Trew was duly and regularly sworn to testify to the truth, the whole truth and nothing but the truth by W. Joseph McFarland, a person then and there lawfully entitled to and having legal authority to administer said oath; that after being so sworn as aforesaid, said Natalie Patricia Trew did willfully, unlawfully and perjuriously testify and state as true material matter which she knew to be false, which matters and things so stated were in substance as follows:

"That she obtained approximately Twenty Six Hundred and no/100 Dollars ($2600.00) as a result of the settlement of her case against the Los Angeles Railway Corporation, a corporation, numbered 432819, theretofore pending in the Superior Court of the State of California, in and for the County of Los Angeles; that she did not remember the entire amount of the settlement; that she did not leave her home after the accident and until January, 1939, and that she was in bed most of the time between the date of the accident on September 18, 1938, until January, 1939, and did not discuss with the defendant, Bingham Gray, the fact that she should stay indoors or in the house during the period between September 18, 1938, and January, 1939; that the last time that she had seen the defendant, Bingham Gray, prior to March 20, 1940, was the day before yesterday, in other words, March 18, 1940, and that when she was subpoenaed to appear before the State Bar Committee, heretofore referred to, she did not know what the subpoena was for; that she had not agreed with defendant Gray to call his office or go to his office if she did receive a subpoena to appear before said State Bar

Committee; that she had no understanding that she might be called to appear before said State Bar Committee; that she had no idea she was going to get a subpoena to appear before said State Bar Committee and the fact that she might get such subpoena was never mentioned by the defendant Gray and that she and her husband, George Trew, did not at any time prior to the time that she was subpoenaed, have a conversation with the defendant Gray about the fact that she might be subpoenaed to testify before the State Bar or the State Bar Committee, heretofore referred to; that the only time in the period of six months prior to the service of the subpoena upon her to testify before the said State Bar Committee in which she had seen the defendant Gray was on one occasion when she had visited said Gray to ask about a job and that she remembered no other occasion upon which she had talked to said Gray in said period of time; that when her attention was directed to the fact that she and her husband had met with the defendant Gray at the corner drug store on or about March 1, 1940, that the reason she had not told about that meeting when first asked to relate her previous meetings with the defendant Gray occurring in the period of six months prior to March 20, 1940, was because she did not think of it and that she had forgotten one or two things, but had tried to remember everything; that during the course of the conversation at the drug store between the defendant Gray, Mr. Trew and Mrs. Natalie Patricia Trew, nothing was said or brought up about the case of Patricia Trew against the Los Angeles Railway Corporation and nothing said about the case that she could remember and nothing was said in that conversation about the testimony of herself before the said Committee of the State Bar that she knew of and that she paid no attention to conversation between the defendant Gray and her husband, George Trew, at the said drug store on or about March 1, 1940.

"That the aforesaid testimony so given by said witness Natalie Patricia Trew, was false and untrue to the knowledge of said Natalie Patricia Trew at the time the same was given and that the same was false and untrue in the following particulars:

"That the said Natalie Patricia Trew did not obtain approximately Twenty Six Hundred and no/100 Dollars ($2600.00) in settlement of her case against the Los Angeles Railway Corporation, but on the contrary, received a much

smaller amount which was approximately Eleven Hundred Fifty and no/100 Dollars ($1150.00) ; that in truth and in fact, the said Natalie Patricia Trew did remember the entire amount of the settlement of her case, heretofore referred to against the Los Angeles Railway Corporation, and that the same was approximately Six Thousand and no/100 Dollars ($6,000.00) ; that in truth and in fact she had left her home after September 18, 1938, the approximate date of the accident, and the month of January, 1939; that in truth and in fact, she was not in bed most of the time between the approximate date of the accident and January, 1939, but on the contrary, was up out of bed and around the house during the major portion of said time; that in truth and in fact she did discuss with the defendant, Bingham Gray, the fact that she should stay indoors between September 18, 1938, and January, 1939, and he advised her to stay in the house at all times after the accident and prior to the settlement of the case, telling her in substance that it would increase her showing of damages as a result of the accident involved and that if she were seen outside the house that someone might take pictures of her movements for the purpose of demonstrating that she was not as badly injured as she claimed to be; that the last time she saw the defendant, Bingham Gray, prior to appearing as a witness before said State Bar Committee on March 20, 1940, was not the day before yesterday, or in other words, March 18, 1940, but on the contrary was on March 20, 1940, within the period of one hour prior to the time that she gave this testimony; that she did in truth and in fact know what the subpoena was for when she was subpoenaed to appear before the said State Bar Committee and that she knew at that time that the subpoena was for the purpose of procuring her testimony as a witness at the hearing of said State Bar Committee and that said State Bar Committee was then and there conducting an investigation and inquiry into the conduct of the said Bingham Gray as a member of the State Bar and a practicing attorney in Los Angeles; that in truth and in fact she and her husband, George Trew, had agreed with the defendant Gray to call his office or go to his office if she did receive a subpoena to appear before said State Bar Committee; that in truth and in fact she did have an understanding that she might be called to appear before said State Bar Committee as a witness and that she knew this because the defendant had told her in substance that several of his clients were

being subpoenaed before said Committee and that she probably would or might also be called upon to appear because she had been one of his clients and that this understanding and conversation between herself, the defendant Gray and her husband, George Trew, occurred on or about March 1, 1940, at a drug store in the vicinity where she and her said husband lived; that at the time she testified before the said State Bar Committee on or about March 20, 1940, she at all times during said testimony knew and remembered the meeting between herself and her husband, George Trew, and the defendant Gray at the drug store in the vicinity of her home, which took place on or about March 1, 1940, and that with regard to said meeting, that there was conversation between those persons heretofore named about the proposed testimony to be given before the said Bar Committee by herself and her husband and that the defendant Gray then and there made arrangements for her to read the deposition theretofore made by her in connection with her suit against the Los Angeles Railway Corporation, in which the nature and extent of her injuries was mentioned, the defendant Gray then and there further called to her attention the fact that she should testify that she received an amount of approximately Twenty Seven Hundred and no/100 Dollars ($2700.00) as her part of the settlement of said case and that the information should be kept away from the said Bar Committee that the defendant Gray had caused the employment of Dr. Moss to attend upon herself as a physician and surgeon and that she should falsely lead the Committee to believe that Dr. Moss was her family physician and that at all times during the course of her testimony before the said State Bar Committee, she knew and remembered the aforesaid conversation in substance and the approximate date thereof.

"That all of the testimony so given by the said Natalie Patricia Trew as aforesaid, was material to the issue and point of inquiry before the said hearing taking place before the said State Bar Special Local Administrative Committee number 1 while engaged in the matters and considerations heretofore set out and in connection with the matters then pending in said hearing before said State Bar Committee in which such testimony was given, as aforesaid, and thereby she, the said Natalie Patricia Trew, did commit willful and corrupt perjury."

Count X charged appellant with suborning perjury in

that on or about March 20, 1940, he procured George Trew to commit perjury in much the same way as alleged in relation to Mrs. Trew in count VIII; that his sworn testimony before the State Bar Special Local Administrative Committee No. 1 was false and untrue in the following particulars: "That he, the said George Trew, did, in truth and in fact, know that his wife, Natalie Patricia Trew, had contacted the defendant Gray by telephone before seeing him on the late afternoon of March 20, 1940, and that said telephone conversation took place several days before March 20, 1940, and in the month of March, 1940, and at a time when the said Natalie Patricia Trew was served with a subpoena to appear before the said State Bar Committee; that the said George Trew had talked with the defendant Gray on the telephone on or about March 1, 1940, and within a short time thereafter and about the same date the said George Trew, Natalie Patricia Trew and defendant Gray met and conversed at a drugstore in the vicinity of the residence of George Trew, on or about March 1, 1940, at which time and place the aforesaid three persons discussed the possibility of Natalie Patricia Trew being called before the State Bar Committee that was investigating matters concerning the conduct of the defendant Gray as a member of the State Bar, and also discussed the manner in which Dr. Moss had been secured to attend upon Natalie Patricia Trew as a result of an accident theretofore had by Natalie Patricia Trew, on or about September 18, 1938, and also discussed that fact that prior to appearing as a witness before said State Bar Committee the said Natalie Patricia Trew should read the deposition which she had given in her case against the Los Angeles Railway Corporation, which deposition was in the office of the defendant Gray; that as a part of the discussion of the said parties, on or about March 1, 1940, the defendant Gray suggested to those present that the State Bar Committee be told that Natalie Patricia Trew received approximately $2700.00 out of the settlement of her case against the Los Angeles Railway Corporation; that the witness George Trew, appearing before the State Bar Committee on March 20, 1940, then and there well knew and well remembered, at all times, that he had seen defendant Gray and talked with him, as aforesaid, on or about March 1, 1940; that in truth and in fact he, the said George Trew, did know the substance of the conversation held on March 4, 1940, when he was asked about the same at said Bar hearing

on March 20, 1940, and that he, the said George Trew, in truth and in fact, had paid attention and was interested in the subject matter of the conversation of March 1, 1940, at the time said conversation took place and did, in truth and in fact, remember the conversation between Natalie Patricia Trew and the defendant Gray in substance and in effect; that in truth and in fact the said George Trew was not telling the truth to his best knowledge and belief on March 20, 1940, because at that time he well remembered the conversations of March 1, 1940, in substance and effect; that in truth and in fact the defendant Gray was not given approximately $2700.00 in connection with the settlement of the case theretofore filed by Natalie Patricia Trew against the Los Angeles Railway Company by George Trew, but on the contrary, received the amount of $2700.00 plus approximately $1500.00, which latter sum of $1500.00 had been unlawfully retained by the said Gray and of which sum Natalie Patricia Trew and George Trew had been deprived by the said Gray to the then knowledge of the said George Trew; that in truth and in fact George Trew had not paid the doctors who had attended upon Natalie Patricia Trew, either in cash or otherwise, and that in truth and in fact he did not have left, after paying the doctors, an approximate amount of $2100.00 out of the settlement received by Natalie Patricia Trew, as a result of her suit against the Los Angeles Railway Corporation, and that in truth and in fact the said George Trew had not told the truth in every instance in his testimony, as is hereinbefore indicated in these assignments of falsity of the testimony of George Trew, and on the contrary, the said George Trew well knowing the answers to the questions thus propounded to him claimed in the instances above enumerated that he did not remember the matters and things to which his testimony was thus directed.''

From the mass of material contained in the foregoing charges by the grand jury and from the evidence reported in the transcript, mention of certain dates and incidents of special importance is desirable at this point, to make clear the sequence of events in which appellant was involved with Mr. and Mrs. Trew.

The first and second charges revolve around Mrs. Trew's deposition taken on February 16, 1939, and concerning which the jury found appellant guilty of soliciting her to commit perjury and also guilty of an attempt to suborn her. They

also convicted him of soliciting both Mr. and Mrs. Trew, a year or so later, when the local committee of The State Bar was investigating appellant's conduct in handling certain of his cases. The hearing on that matter was held on March 20, 1940, and the time of solicitation as to both Mr. and Mrs. Trew was fixed by the grand jury in its indictment (counts V and VI) as on or about March 1, 1940. This was the approximate date when the transcript clearly shows that Mr. and Mrs. Trew were in conference with appellant at a drug store not far from the Trew residence. It appears from the record that on the night of March 20, 1940, Mr. and Mrs. Trew had dinner with appellant in a restaurant just across the street from the office building in downtown Los Angeles where the hearing was held. An hour or two later Mrs. Trew was called before the committee and lied under oath substantially as set out in count VIII, upon which appellant's conviction of suborning her was based. When it appeared that Mrs. Trew was getting beyond her depth in a morass of false testimony she was temporarily excused and her husband immediately brought before the committee. It was not long before he became involved in contradictory and patently perjurious statements and then both he and Mrs. Trew testified to the falsity of their testimony in the earlier part of the hearing. Upon George Trew's false testimony when first before the committee appellant's conviction of suborning him (count X) is based.

Counsel for appellant argue in their opening brief that the testimony of Mr. and Mrs. Trew is so completely discredited and so inherently improbable and that their testimony and the testimony of Mrs. Davis, the mother of Mrs. Trew, is in such irreconcilable conflict with admitted circumstances that it does not constitute the type of substantial evidence essential to sustain a verdict of conviction on any of the counts involving appellant with Mr. or Mrs. Trew.

In reply to this argument it may be said that the jury was instructed as follows:

". . . A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony as to any matter material to the cause on trial.

"A witness willfully false in one material part of his or her testimony is to be distrusted in other; that is to say, the jury may reject the whole of the testimony of a witness who

has willfully sworn falsely as to a material point; and the jury, being convinced that a witness has stated what was untrue as to a material point, not as a result of mistake or inadvertence, but willfully and with the design to deceive, may treat all of his or her testimony with distrust and suspicion, and reject all *unless they shall be convinced that he or she has in other particulars sworn to the truth.*" (Italics added.)

There can be no doubt in the mind of anyone who reads the transcript in this case that the members of this jury knew they were listening to the testimony of admitted perjurers, but they also knew that people of that type are the very ones who may be most easily suborned or successfully solicited to commit perjury. They also saw the appellant on the stand and heard his testimony as a witness in his own behalf. They were charged by the court as to all witnesses as follows:

"The jury are the sole and exclusive judges of the effect and value of evidence addressed to them and of the credibility of the witnesses who have testified in the case. The character of the witnesses, as shown by the evidence, should be taken into consideration for the purpose of determining their credibility and the facts as to whether they have spoken the truth. And the jury may scrutinize not only the manner of witnesses while on the stand, their relation to the case, if any, but also their degree of intelligence. A witness is presumed to speak the truth. This presumption, however, may be repelled by the manner in which he testifies; his interest in the case, if any, or his bias or prejudice, if any, against one or any of the parties; by the character of his testimony, or by evidence affecting his character for truth, honesty or integrity; however, said character evidence is to be considered by you for no other purpose whatever than to aid you in determining the credibility of said witness, or by contradictory evidence."

It is apparent that the jury decided, as was their right, to give credence to the testimony of Mr. and Mrs. Trew on the material points that resulted in appellant's convictions.

Notwithstanding the many pages which counsel have devoted to the claimed inherent improbability of the testimony of Mr. and Mrs. Trew, buttressing their arguments with contradictory statements made by those witnesses at various hearings (including a Grand Jury investigation in March 1940, and hearings before The State Bar trial committee in

July and August, 1940), and calling our attention to inconsistencies on divers occasions in their attitude toward appellant, we fail to find it, or the testimony of Mrs. Davis, so "inherently improbable as to be impossible of belief" and that therefore it "must be considered to be in effect no evidence at all." ▮ This is the only condition which under the authority of *People* v. *Von Perhacs*, 20 Cal. App. 48, 51 [127 Pac. 1048], and cases therein cited, would warrant this court in disturbing the conclusion of the trial judge in passing upon the sufficiency of the evidence to support the verdicts when considering the motion for a new trial. ▮ In the instant case the motion was made upon the ground, among others, that the verdicts rendered by the jury were contrary to the evidence. That there was a substantial conflict in the evidence produced at the trial there can be no doubt, and the rule in such a case is stated in the well-considered case *Fowden* v. *Pacific Coast Steamship* Co., 149 Cal. 151 [86 Pac. 178] at p. 162: "Where there is a substantial conflict in the evidence, however much the evidence may preponderate against the verdict, the sole remedy of the aggrieved party is his application to the trial judge for a new trial. It is the duty of the trial judge, who has heard the evidence and had ample opportunity to judge as to the amount of credit to be given to the various witnesses, to grant a new trial when he is of the opinion that the verdict is clearly against the weight of evidence, notwithstanding that there is a substantial conflict therein. No such power exists in this court. . . . The final responsibility must rest where it is placed by the well-settled law,—with the trial court."

While that was a civil case tried by a jury the rule has at least as much validity in a criminal case, and in this criminal case the motion for a new trial was denied by the trial judge.

We have no doubt that the same arguments touching upon the weakness of the testimony of Mr. and Mrs. Trew, which are presented so ably and at length in the appellant's briefs, were made eloquently and at length before the jury at the close of the trial and again when the motion for a new trial was heard by the trial judge, but it must be noted that the jurors were not limited in their consideration of the evidence to the statements of the Trews. Various other important matters were before them. For example, Cecil Borror, his brother William Floyd Borror and their friend Edward Miller, all of whom were injured in an automobile collision,

testified that at approximately the time when they engaged appellant to represent them in damage actions he counselled them to follow a deceptive course which would tend to exaggerate their injuries. According to William Floyd Borror "he said I should lay there in bed, when I first got hurt, a little longer, and it would make the case look better," and Cecil Borror testified, "Well, he was telling Edward Miller not to go to work and my brother to take it easy" and as to his brother, William Floyd, . . . he said something about his head and back injuries would be best because they can't prove you are not hurt in the back and head and spine injuries." Edward Miller gave similar testimony: "He told us we wanted to be sure not to go around very much, because somebody might see us, and to stay off of street cars and everything, because if they would see us jumping on and off street cars like that and would take pictures of us going around like we were not hurt, we wouldn't have any chance. . . . Why, he talked more about the injuries, and I told him my head ached about a day or two days after the accident; and he told me to keep having headaches and playing like I had real dizzy spells, because he said I didn't have to be scared, because no X-rays and no doctor couldn't say there wasn't anything wrong with my head. . . . I told him I was running short of money; and he said I didn't have to worry about that, because he would fix it up to get some money for us so that we could let things get through and all, so that we could get some money; and he told me I couldn't go back to work for quite a while. . . . He said he would let me know when I could go back to work."

Mr. Charles P. Carter was injured in an automobile collision on November 11, 1938, and engaged appellant to represent him. In January following, his deposition was to be taken, and he detailed to the jury some of the advice given him by appellant as follows: "He said to stress my injuries, pile it on, that the doctors would back up whatever I testified to. . . . He said to tell them that I was unconscious for quite a while and to tell them that blood ran out of my ear, and several other things that I don't recall. Q. What did you say to him about the proposition of having blood run out of your ears? A. I told him none ran out, and that would be perjury and I wouldn't testify to that. Q. What did Mr. Gray say about that? A. He said the value of the case would be decreased considerably. Q. Was anything said about

X-rays? A. Yes; he said that he would have some X-rays taken later on, that Dr. Walker was an X-ray expert at the Los Angeles County Hospital, and that no two doctors would read them alike and that Dr. Walker's reading of the X-rays would have a lot of weight in the case. Q. Did Mr. Gray at any time tell you what the blood in your ear would indicate? A. . . . As well as I recall, he said a basal fracture.''

On cross-examination this witness testified as follows: ''Q. Don't you know as a matter of common knowledge that a basal fracture of the skull is one of the most dangerous fractures of the skull and is accompanied by many more symptoms than blood running out of the ear? A. So Mr. Gray told me. Q. And don't you know that a person who gets a basal fracture of the skull is a very sick person for weeks at a time, and frequently dies? A. Mr. Gray told me just that.''

It may be noted here that Mrs. Trew early in this trial gave the following testimony:

''. . . when I entered the office, I asked Mr. Gray how I had done on my deposition; and he told me he was very disappointed and that I had not done as he told me to do; and that cases like that were settled out of court every day for $200.00 or $300.00; and that he had more money than that tied up in the case; and he had done quite a bit of work on it; and he told us then he was just going to have to put more into my deposition; he said he was going to put it in there that I had seen a drop of blood in the lobe of my ear. He said if there is a basic skull fracture and there was no X-ray, no doctor could tell any difference. My husband and I both told him we would not agree to anything like that; and he said, 'Well, it does not matter if you agree or not, I am going to put it in.' We told him if he did put it in he would put it in by himself and we didn't want anything to do with that . . . .''

Mr. Trew's version was as follows: ''Well, Mr. Gray was very disappointed in my wife's deposition. He told her he was very disappointed in it, and he said he settled cases every day like this for just a little,—he said a specific amount, but I don't remember what it was,—and he scolded her a good deal for not giving a good deposition and not saying everything he had told her to say; and he said that in order to get anything out of the case he would have to add something in the deposition, something about her ear. He said, 'We will put in there that you—I think he said have got a fracture

at the base of the ear, and the X-ray can't prove anything there'."

We have thus far discussed the convictions which resulted from appellant's transactions with the Trews. The jury also heard testimony concerning his effort to persuade George Gallina to give false testimony concerning an automobile collision which Gallina witnessed, in the neighborhood of Bakersfield, and convicted him of soliciting perjury in regard thereto. The details of this offense are recited in count XII of the indictment as follows:

"That on or about the 22nd day of May, 1940, the said defendant Bingham Gray then and there knowing and believing that the said George Gallina was to become a witness for the superior court of the State of California, in and for the county of Los Angeles, in connection with the aforesaid actions and suits by the said Jesse Webb, Frank Curtis and William B. Allen, and then and there knowing and believing that the said George Gallina was to be duly sworn to testify to the truth, the whole truth and nothing but the truth with respect to material matters in the taking of testimony on direct and cross examination in the aforesaid suits and actions, said defendant, Bingham Gray, did knowingly, willfully, unlawfully, and corruptly solicit the said George Gallina to willfully, knowingly, falsely and perjuriously testify, swear and state as a witness in the giving and taking of his testimony when called to the witness stand, in substance, as follows:

"That he did not notice whether the parties plaintiff, or any of them, had their hands out, or had a hand out, just prior to the collision, or whether they did not; that he, the said George Gallina did not remember if a hand signal was given and that he, the said George Gallina, should forget a few things and that he should forget that on the night of the accident occurring approximately September 29, 1939, out of which the aforesaid causes of actions arose, he did say that no hand signal was in fact given by parties plaintiff, or any of them, and that he should testify that he did not remember that he saw one way or another with regard to a hand signal being given in connection with the accident he had witnessed.

"That in truth and in fact, to the knowledge of the said defendant Bingham Gray, the said testimony so solicited by him was false in the following particulars:

"That the said George Gallina did have a clear and distinct recollection of the events connected with the accident occurring on September 29, 1939, out of which the aforesaid plaintiffs' causes of actions arose and that he did remember definitely and distinctly that no hand signal was given at any time that he observed the cars involved in the accident by anyone in the car in which plaintiffs were riding.

"That in truth and in fact said defendant Bingham Gray well knew the falsity and perjury of the statements and testimony which were so solicited by him to be made by the said George Gallina, under oath, at the time he was to be called as a witness, as aforesaid, and the said Bingham Gray well knew that the matters and things as to which he was soliciting said George Gallina to testify were not true to the knowledge of said George Gallina."

It is contended that the evidence adduced at the trial was insufficient to sustain the conviction on this count. Three points are urged: first, that the subject concerning which perjury was solicited, was immaterial; second, that the testimony of George Gallina was not corroborated; and lastly, that his testimony was inherently improbable. As to the first point, —since the answer to the suit brought by appellant in behalf of his clients set up in general terms contributory negligence on their part, and since, according to Gallina's testimony, appellant solicited him to testify falsely concerning his observation upon that matter, it is apparent that appellant considered the subject very material. And, in our opinion, it was. Furthermore, Gallina told the jury that at the trial of the damage action he testified that he could have seen the hand signal if the driver of the coupe had his hand out; that when the coupe started to turn left he could still see a little ahead of him. The first point then, is not well taken. As to the second point, corroboration was furnished by Ann Gallina, the wife of George, who testified that at the time of the trial of the damage action appellant called at her home about 4:00 p.m. and waited there two hours or more for her husband. Meanwhile, upon learning that Gallina had been subpoenaed he said, according to Mrs. Gallina, "I wouldn't know what they are going to pay George", (referring to the insurance company), "I suppose just a few dollars. . . . Well, if he was my witness I could give him a little more money"; further that appellant said to her, "I wish you would talk to your husband and get him on my side, I would like him to help

me.'' This conversation was said to have occurred some little time, days or weeks, after Gallina, according to his statement to the jury, had told appellant and his brother that he saw no hand out when the coupe made the turn. When, on the afternoon in question, after a two-hour wait on the part of appellant, Mr. Gallina finally came home, he and appellant engaged in conversation and the jury were told by Mrs. Gallina that she heard her husband say, ''I am not for no one; I am just telling the truth. . . . I am only going to tell what I saw.'' Mrs. Gallina testified also that on a prior occasion, but after the accident, appellant called at her home while her husband was away and asked if she and her husband wanted to go out with him; proposed that Mrs. Gallina get him a girl, the four of them to go somewhere. Under the rule cited in *People* v. *Todd,* 9 Cal. App. (2d) 237, 242 [49 P. (2d) 611], corroborative testimony in a case of this sort need not be strong. We believe it was quite sufficient as herein shown, (See *People* v. *Yeager,* 194 Cal. 452 [229 Pac. 40]; *People* v. *Dahl,* 107 Cal. App. 302 [290 Pac. 608]; *People* v. *Humphrey,* 27 Cal. App. (2d) 631, 640 [81 P. (2d) 588]), and we therefore omit reference to additional corroboration which was presented to the jury.

As to the last point,—the argument that the testimony of Gallina is inherently improbable carries little weight in view of the fact that appellant called at the Gallina home and according to the witness Alma Pappas who accompanied him there, ''mentioned that the Bakersfield case was being tried and Mr. Gallina said Yes, he knew it, he had been subpoenaed by the insurance company and had been in court for several days listening.'' The jury may have concluded (we almost said ''must have concluded'') that this visit at this critical time,—while the case in which Gallina was to be a witness was merely adjourned overnight,—had a special purpose and object in view; such, for instance, as a last chance to obtain perjured testimony in the tort action. Gallina's testimony in this criminal trial was not incredible in our opinion; quite to the contrary.

Appellant complains that the court committed error in admitting as hearsay evidence a transcript of the testimony which was given by Mr. and Mrs. Trew during the second part of the proceeding before the State Bar committee on March 20, 1940, a hearing at which appellant was not present.

This transcript was read to the jury after objection to its introduction was made and overruled. After the reading the following took place:

"Mr. Hanna (Attorney for Appellant): Your Honor please, at this time we move the court to instruct the jury, first, that no part of this evidence which has been introduced by this transcript of these proceedings before The State Bar committee on the evening of March 20th shall be considered or taken by them as any evidence of the testimony which either Mr. or Mrs. Trew gave that evening was untrue; secondly, that none of this evidence shall be taken by them as any evidence that anything related therein to have been done or said by Mr. Gray was done or was said.

"The Court: What is your position on that motion, Mr. Kearney?

"Mr. Kearney (Deputy District Attorney): Well, I think that motion is probably correct, that they are not to take the inference from the reading of that, they are to take it from the testimony of the witness on the stand; but that is put in merely to show the perjured testimony that is charged in some of the counts of the indictment. They can only take that as proof of what was testified to there, that is proof of the fact they testified there under oath. I think that is correct.

"The Court: The jury will be so instructed and admonished."

It is clear from this that the purpose of the district attorney was to satisfy the jury that the Trews in the second part of the hearing admitted the falsity of their statements, that is, their perjury, during the first part. They gave testimony to the same effect directly to the jury which tried this case, and in the presence of this appellant, thereby curing, as respondent points out, any error which otherwise might be said to have arisen, notwithstanding the court's limitation upon the purpose for which the transcript was admitted.

█ The claim is also made that the court erred in overruling appellant's objection to admission of the testimony of Charles P. Carter, and of Cecil Borror, William Floyd Borror, Edward Francis Miller and his mother, Mrs. Laura Miller. In answer to this objection it may be said that it appeared in certain counts in the indictment, as for example, in count VIII charging subornation, that The State Bar Special Local Administrative Committee, number 1, in pursuance of their duties under the law, conducted an inquiry into the ethics

of Bingham Gray in practicing his profession as attorney-at-law and into his conduct as a member of The State Bar; that each of the above named witnesses was called before that committee and examined under oath concerning his dealings with appellant as hereinbefore related, and in view of the advice given the jury at the time objection was made it is our opinion that the court committed no error in this regard. The remarks of the court on this subject were as follows:

". . . The court will advise the jury at this time that the evidence, if any, of general similar acts and transactions with parties not named in the indictment will be admitted for the limited purpose of evidence of common design of criminal enterprises, if any, charged in the hereinafter designated counts of the indictment, and for the limited purpose of proving a general plan or scheme to defraud, as well as to prove consciousness of guilt. Such evidence will be and is admitted only as to the following counts—and I would suggest that you make notations of these counts as to which this particular line of evidence will be limited—

"Counts 1, 2, 5, 6, 7, 8, 9, 10, 11, 12 and 14."

The jury were also given a written instruction on the same matter which will be quoted hereinafter. The correctness of the ruling as to the testimony of each and all of these witnesses is clearly established by a reference to *People* v. *Baker,* 25 Cal. App. (2d) 1 [76 P. (2d) 111], where at page 4 the court says: "It is the next contention of the defendant that the court erred in refusing to strike the testimony relating to other offenses because the *corpus delicti* of the alleged similar offenses also was not sufficiently established. This evidence was admissible to show guilty knowledge and the intent of the defendant and to establish a definite prior design or system, and a continuing conspiracy, and it is not essential that such similar transactions shall have resulted in the commission of a crime. It is sufficient if they tend to prove a scheme of the defendant which included the acts charged."

Objection is made by appellant to the latitude permitted by the court in the cross-examination of Miss Alma Pappas, a witness produced by the defense at the trial. It appeared that this witness, a close friend of appellant, who at one time wore his diamond ring, had had a falling-out with him some little time before the trial of this case but that they had made up their differences. When, at the trial, on direct examination she gave testimony strongly in his favor it was

but natural and altogether proper for the district attorney to attack her credibility. In this connection he asked her if she had not told an investigator of The State Bar "to check the Trew matter, that there was something there and that Gray was plenty worried about it." To this the witness replied, "I may have said that, but it wasn't the truth." Since Miss Pappas had been called before the grand jury on March 26, 1940, and there made statements under oath directly contrary to those made under oath to the jury which tried this case the court committed no error in allowing searching cross-examination. Nothing appears in the record to indicate that it went beyond proper bounds in the effort to impeach the witness.

The trial of this case opened on Monday, March 10, 1941, and taking of testimony continued uninterruptedly on all court days until the last witness left the stand on Thursday, April 3rd. It finally went to the jury on Wednesday of the following week, the representatives of the district attorney's office meantime taking approximately a day to present their opening and closing arguments; the two attorneys representing the appellant, three days. The jury returned with their verdicts on Friday, April 11th.

Considering the length of time spent in trial and the number of counts submitted for the jury's consideration it is not surprising that a large number of instructions were handed to the court. Some were given to the jury; some were refused; others were given as modified. So far as we can determine, the treatment accorded the submitted instructions was, in every instance, correct. Appellant's counsel have taken a different view, and with the same diligence and exhaustive argument that characterized their efforts in the courtroom they present to us, in their briefs, their objections. We have read them all and find that they have been carefully analyzed and ably refuted by respondent. Since the briefs can be read by anyone interested we do not feel warranted in discussing any of these objections at length but shall comment upon a few. ▇ One related to character testimony offered for and against the defendant. As to evidence that appellant's reputation for truth, honesty and integrity was bad, the court, at his request, charged the jury that such evidence "does not destroy, impair or affect the presumption of innocence, and must not be considered by you as having

any effect toward counteracting that presumption. Neither does such evidence constitute any part of the evidence which the prosecution is required to introduce to prove the defendant guilty beyond a reasonable doubt in order to warrant a conviction upon any count contained in the indictment.

"The prosecution has introduced evidence attacking the general reputation of the defendant for truth, honesty and integrity.

"You are instructed that such evidence may be considered by you for the limited purpose only of determining the credibility of the defendant's testimony and the weight to be given to it. You must not consider such evidence as any evidence that the defendant is guilty of any of the offenses charged in the indictment or as evidence of the probability of the guilt of the defendant of any of the offenses charged in the indictment. Such evidence does not affect the question of guilt or innocence of the defendant to any extent except to the extent that it may be considered by you as affecting the credibility of the defendant's testimony."

At the request of the prosecution the following instruction was given:

"Evidence of good character is evidence relevant to the question of guilty, or not guilty, and is to be considered by you in connection with the other facts and circumstances in the case. Evidence of good character may raise a reasonable doubt of guilt in a case in which, without such evidence, no such doubt would exist.

"But if you are satisfied to a moral certainty and beyond a reasonable doubt that the defendant is guilty as charged in the information herein, it will be your duty to so find him, notwithstanding such evidence of good character."

Appellant claims that there was an irreconcilable conflict between these two instructions which worked to his detriment. Upon a careful reading, however, it will be seen that the first instruction related to evidence introduced by the prosecution that the appellant's reputation was bad, while the other related to evidence introduced by the appellant that his reputation was good. In other words there was here no instruction upon the weight or effect of character testimony as such, but only as to the consideration that might be given to the evidence bearing upon appellant's bad reputation and to the opposing evidence bearing upon his good reputation.

650

We see no real conflict between these two instructions relating to two different kinds of evidence, but to us it seems clear that, as appellant certainly suffered no impairment of his rights by reason of the instruction which his counsel requested, neither did he, by the instruction which told the jury that evidence of his good character might be sufficient to save him, at the jurors' hands, from what otherwise would be a verdict of guilty. (*People* v. *Baldocchi,* 10 Cal. App. 42, 47 [101 Pac. 28]; *People* v. *Piner,* 11 Cal. App. 542, 553 [105 Pac. 780]; *People* v. *Buchanan,* 119 Cal. App. 523, 526 [6 P. (2d) 538].)

▆ After the jurors retired to the jury room they were given all the written instructions which the court had previously read to them. Among these were proper instructions on the doctrine of the presumption of innocence and the requirement of proof beyond reasonable doubt. Another instruction received by the jury read as follows:

" (~~You are instructed that~~) -you have no right to disregard the testimony of the defendant on the ground alone that he is a defendant and stands charged with the commission of the crime. (~~The law presumed the defendant to be innocent until he is proven guilty, and~~) -the law allows him to testify in his own behalf, and the jury should fairly and impartially consider his testimony, together with all the other evidence in the case, and if from all the evidence you have a reasonable doubt as to the guilt of the defendant, you should acquit him. (~~And in this connection you should remember that the defendant is presumed to speak the truth, and unless this presumption is destroyed by the evidence in the case, your oaths require you to find that he has spoken the truth~~)."

Because the jury thus beheld that the court struck out language which would have been merely repetitious, admitted so to be by appellant's counsel, they now claim that in some way the court erred. This is a groundless claim.

"Appellant testified" (quoting from his counsel's brief) "that in 1938 he handled 27 personal injury cases involving aggregate recoveries of $64,115.00; that in 1939 he handled 27 personal injury cases involving aggregate recoveries of $99,303.45 and that during the first five months of 1940 he handled 12 personal injury cases involving aggregate recoveries of $41,609.54," and "it was shown that The State Bar

Investigating Committee investigated approximately seventy-five of appellant's cases." It is urged therefore that the court erred in failing to give, in full, an instruction requested by appellant as follows:

"(You are instructed that) $\overset{E}{\text{evidence}}$ has been introduced of alleged offenses committed by the defendant other than those pleaded in the indictment. (You are instructed that) $\overset{S}{\text{such}}$ evidence may be considered by you only as bearing upon the question of whether there was a system or plan of the defendant to commit offenses of the type charged in the indictment or as evidence of guilty intent or as evidence of consciousness of guilt; (and in this connection you may properly consider the number and relation of the cases and transactions concerning which evidence has been introduced by the prosecution in proportion to the total number of cases or transactions of the defendant during the period of time to which the evidence introduced by the prosecution relates)." Instead, the court drew a line through the words and phrases which we have enclosed in parentheses and suffered the instruction in that condition to be seen by the jury. We do not believe the court erred in disapproving the portion of the instruction which was stricken, nor yet in permitting it to go to the jury in the form which counsel deprecates. If any of the jurors noticed the stricken portion they could only conclude that the court did not agree with appellant's counsel on the principle which they undertook to state, and since in our opinion the court was right, for a number of reasons which we shall not take time to state, no harm was done.

 Formula instructions were given on each of the counts upon which appellant was convicted. Each such instruction began with the following phrase in which the word "facts" was used by mistake for "statements." "If you believe from the evidence beyond a reasonable doubt that the following facts are true then you should convict the defendant. . . ." This, as we all know, is a common error in the use of English, but we cannot believe the jurors were in any way misled by it, for by the very words of the quoted phrase they knew that they were charged with the duty of determining upon the evidence which had been presented to them whether certain things, incidents or elements thereafter listed in the instruction were or were not true.

They were also instructed that "Where, as in cases of perjury and of subornation of perjury, several distinct assignments of perjury are laid, the indictment will be sustained if any one of these be proved, if that, by itself, be sufficient to constitute the offense."

The formula instruction on count I read as follows: "If you believe from the evidence beyond a reasonable doubt that the following facts are true, then you should convict the defendant of soliciting another to commit perjury, as charged in count I of the indictment.

"(1) That at all times mentioned in count I of the Indictment there was duly pending in the superior court of the State of California, in and for the county of Los Angeles, the civil action referred to in count I of the Indictment, namely, *Natalie Patricia Trew* v. *Los Angeles Railway Corporation*.

"(2) That said superior court had jurisdiction of said civil action.

"(3) That on or about February 16, 1939, at and in the County of Los Angeles, State of California, the defendant, knowing that the deposition of said Natalie Patricia Trew would be taken by the defendant in said civil action, and that said Natalie Patricia Trew would be sworn to testify to the truth in said deposition, did knowingly, wilfully, unlawfully and corruptly solicit and instruct the said Natalie Patricia Trew to willfully, knowingly, falsely and perjuriously testify as a witness in said deposition in substance and effect as alleged in count I of the Indictment.

"(4) That said solicited testimony was false, as alleged in count I of the Indictment.

"(5) That said defendant knew said solicited testimony was false.

"(6) That said Natalie Patricia Trew knew that said solicited testimony was false.

"(7) That defendant knew that said Natalie Patricia Trew knew that said solicited testimony was false.

"(8) That said solicited testimony was material to the issues involved in said civil action. *I instruct you as a matter of law, that said solicited testimony was material to the issues involved in said civil action.*" (Italics added.)

We have emphasized the last sentence to indicate the main ground of appellant's objection to this instruction. Quoting from his brief, "This instruction told the jury, among other

things, that all of the alleged solicited testimony, *specified in count I* was material." (Our italics.) He then recites certain items of alleged solicited testimony specified in count I, concluding "The jury was thus told that the above quoted statement about Dr. Moss was material testimony upon the taking of Mrs. Trew's deposition. The fact is that that testimony would never become material unless and until Dr. Moss took the witness stand and testified, and then the only materiality of the testimony would be for the purpose of attacking Dr. Moss's credibility by showing his interest." Appellant then argues, "To constitute perjury, it is essential that the testimony be material at the time it is given." Here he overlooks the important point that count I did not charge appellant with the crime of perjury, but with the crime of soliciting Mrs. Trew to commit perjury. In such a situation respondent correctly states the rule in his brief: "Appellant argues throughout this topic of his brief the theory that the statements of Mrs. Trew were not perjury because they were not material and therefore appellant could not be guilty of the crime of solicitation under section 653f of the Penal Code. This is where he falls into error, commonly observed when a violation of section 653f of the Penal Code is involved. We repeat again, that in order for a person to be guilty of that section, it is not necessary that the person solicited shall actually commit perjury. Whether the false testimony that she gave at the taking of her deposition, and which was solicited by appellant, was, at the time of the taking of the deposition, perjurious, is entirely immaterial, for a deposition taken under the provisions of the Code of Civil Procedure may be read into evidence, (§ 2022, Code of Civ. Proc.), and if read into evidence and the testimony at that time material, it would be perjury. Appellant had no way in the world of knowing that the testimony he solicited Mrs. Trew to testify to falsely would not be material. He had every reason in the world to believe that Dr. Saul Moss, her attending physician, would testify concerning her injuries at the time of trial. That whether or not Dr. Moss was retained by appellant to look after Mrs. Trew (she not having heard of him previously) or whether he was her family physician and had been her aunt's physician for some time would certainly go to the doctor's interest and his credibility in the case. There of course can be no question that perjury can be assigned upon

testimony which goes to the credit of a material witness in a case. (*People* v. *Metzler*, 21 Cal. App. 80, 82 [130 Pac. 1192]; *People* v. *Barry*, 63 Cal. 62, 64.)

"The test of perjury is not whether the false testimony actually does influence the tribunal or jury but whether it can influence it. (*In re Braynard*, 52 Cal. App. 631, 634 [199 Pac. 576].)

"What has been said about the false testimony pertaining to Dr. Moss is true as to each of the other items of false testimony solicited by appellant of Mrs. Trew and above quoted."

 Similar complaints to the formula instructions on count II and count V are correctly disposed of by the same reasoning. As to the formula instruction on count V, appellant also complains that the State Bar committee " . . . certainly had no power to inquire into the incident as to whether appellant had solicited Mrs. Trew to testify falsely upon the taking of her deposition. Such actions were not within the purview of the investigating authority of the committee and therefore testimony before the committee relating to such subjects was not material." This complaint is effectively answered by the following excerpt from respondent's brief: "Appellant also states that the resolution which was actually adopted authorizing the committee to investigate the subjects mentioned in the resolution confined its activities to ambulance chasing. The authorization quoted may in no way be so limited. It will be noted that the term 'ambulance chasing' is stated parenthetically. Ambulance chasing is properly used to embrace all forms of unethical solicitation and handling of nearly any type of litigation. The resolution permitted the committee to investigate, among other things, 'evils incident thereto'—evils incident to the 'settlement, prosecution . . . of personal injury, . . . claims and litigation.' Certainly the solicitation of one to commit perjury in connection with the settlement of a personal injury action is an evil, incident to the settlement, prosecution, or defense of that particular personal injury claim.

"It therefore follows that the subject of inquiry followed by the Administrative Committee in question was material to its investigation and properly within the scope of its authorization."

 Various objections are made to the formula instruction on count VIII charging appellant with suborning Mrs. Trew, all of which in our opinion are sufficiently answered by

respondent, reliance being had upon *People* v. *Follette,* 74 Cal. App. 178 [240 Pac. 502], in which case the court said at page 199: ''The indictment, as we have already observed, contains a large number of assignments of perjury. It may be that the evidence is not sufficient to sustain all of such assignments, but the rule is well settled that while the indictment may embrace two, or more, or many assignments of perjury, if the evidence sustains one or more of the assignments it is not necessary for the prosecution to prove all of the charges.'' The court here cites the case of *State* v. *Taylor,* 202 Mo. 1 [100 S. W. 41].

The objections to formula instructions on counts X and XII are similar to those urged against other instructions herein mentioned, and are equally groundless.

▪ Appellant claims that he was prejudiced by the court's refusal to instruct the jury as follows: ''You are instructed that the fact that the court has advised you to return a verdict of acquittal on two of the counts in the Indictment is not to be taken by you as any indication that you should convict the defendant on any of the counts in the Indictment.'' Since the jury was adequately instructed upon reasonable doubt and presumption of innocence, he was sufficiently protected under the law; this instruction, therefore, was unnecessary and the court did not err in refusing to give it.

▪ An additional instruction which the court refused to give was this: ''You are instructed that counts I and II of the Indictment are alternative counts, and you must not convict the defendant of the offenses charged in both of said counts.'' Appellant states that ''This instruction became particularly essential and proper in view of the fact that the court instructed the jury that they might find the appellant guilty of attempted subornation of perjury under the allegations of count II of the indictment,'' and argues that counts I and II were based upon identical acts of the appellant. Count I was based on an act charged to have been committed on or about February 2, 1939; namely, soliciting Mrs. Trew to commit perjury. On February 16, 1939, Mrs. Trew went before the notary public who took her deposition, swore to tell the truth and lied. If this were perjury the crime of suborning it would be complete on that date and not before. But section 124, Penal Code, says, ''The making of a deposition, affidavit or certificate is deemed to be complete, within

the provisions of this chapter, from the time when it is delivered by the accused to any other person, with the intent that it be uttered or published as true.'' Mrs. Trew, according to the record, failed to sign or deliver her deposition and it may be that for that reason the court felt justified in instructing the jury that ''the evidence as to count II of the indictment has failed to prove the defendant guilty beyond a reasonable doubt of the crime of Subornation of Perjury in violation of section 127 of the Penal Code.'' This was followed by the further instruction: ''You are further advised however, that you have the right, in your discretion and under the evidence, as to count II, to find the defendant guilty of the crime of Attempt to commit the crime of Subornation of Perjury, a felony, as the crime of Attempt has been defined for you in these instructions. You are not bound by the court's advice in this connection.'' The attempt became complete when Mrs. Trew gave her false testimony on February 16th and not until then. It is manifest, therefore, that counts I and II were not based on identical acts and appellant was not aggrieved by the court's refusal to give the requested instruction.

Another instruction which the court refused to give read as follows: ''You are instructed that the defendant is presumed not only to be innocent of the offenses charged in the indictment, but of any other offense, and you must presume that the defendant was innocent in all of his other acts and transactions revealed by the evidence, unless you are convinced to the contrary by evidence beyond a reasonable doubt.'' That no error arose from this refusal appears from the reasoning of respondent as follows: ''The instruction thus proposed by appellant, would have made it necessary for the jury to find appellant guilty beyond a reasonable doubt of the other alleged offenses. This is not the law and it is not necessary that the evidence of other offenses be proved beyond a reasonable doubt. In *Lund* v. *State*, (1934) 207 Ind. 347 [190 N. E. 850], the court said at page 853: 'Appellant tendered instruction No. 4, which was to the effect that the evidence concerning other and similar transactions, which was admissible for the purpose of showing knowledge, must be proven beyond a reasonable doubt before it could be considered by the jury. The instruction was properly refused. It is only the ultimate material facts to which the rule of reasonable doubt applies. The facts regard-

ing the other transactions were simply evidentiary facts introduced for the purpose of being considered, together with all of the other evidence in the case, upon the question of criminal knowledge and intent; and though the jury may have entertained some reasonable doubt as to some of the other transactions, or some of the other items of evidence, which tend to prove guilty knowledge or intent, if, notwithstanding that fact, and having considered the evidentiary facts, doubtful and otherwise, they were convinced beyond a reasonable doubt of the ultimate fact of guilty knowledge and intent, it is sufficient'.''

 In addition, we may say that defendant was not on trial before this jury for all his other acts and transactions revealed by the evidence. If any of them had been charged as crimes against him of course he would have been entitled, as to each offense so charged, to an instruction such as immediately follows. The court properly instructed the jury as to the counts on which he was tried, in this language: ''A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal but the effect of this presumption is only to place upon the state the burden of proving him guilty beyond a reasonable doubt.''

 Appellant claims that error arose when the court refused to instruct the jury as follows: ''The court has permitted the prosecution to introduce evidence of other acts of the defendant claimed by the prosecution to constitute offenses similar to those charged in the indictment. You must determine the question as to whether or not the defendant committed any such similar offenses solely upon the evidence introduced, and you must not speculate or indulge in any conjecture that there were any other acts of the defendant which constituted similar offenses and concerning which no evidence has been introduced.''

''In the cross-examination of certain witnesses testifying upon the question of the defendant's reputation, questions were asked which implied or suggested that the defendant had been guilty of acts of misconduct concerning which no evidence has been introduced.

''You are instructed that since no evidence upon such subjects was introduced, you must conclusively presume that

defendant was innocent of any such suggested acts of misconduct.''

Inasmuch as the jury was instructed ''to judge of the facts upon the testimony and other evidence produced here in court'' and ''You are to be governed therefore solely by the evidence introduced in this trial and the law as given you by the court. The law will not permit jurors to be governed by mere sentiment, conjectures . . . ,'' we feel that no error arose in the court's refusal to give these instructions. Respondent calls our attention to the fact that ''every objection to questions asked on cross-examination of character witnesses offered by appellant, which questions implied or suggested that appellant had been guilty of acts of misconduct other than those upon which evidence was introduced, was sustained, and the following instruction, therefore, applies: '. . . and if any counsel has intimated by questions, which the court has not permitted to be answered, that certain things are, or are not, true, you must disregard such questions and refrain from any inferences based upon them' ''; and ''Furthermore, the court expressly instructed the jury at the request of the defendant that evidence attacking the general reputation of the defendant for truth, honesty and integrity should not be considered as evidence that the defendant was guilty of any of the offenses charged in the indictment or as evidence of the probability of guilt of the defendant, and that such evidence was admissible only for the purpose of determining his credibility.''

Appellant complains of the court's action in refusing to give other requested instructions but we find no merit in any of them.

He also charges the deputy district attorney who prosecuted this case with misconduct in many particulars; but as to almost all the specifications noted in his brief there was no assignment whatever made during the trial. The rule in such a case was stated in simple language in *People* v. *Brittan*, 118 Cal. 409 [50 Pac. 664] at p. 412: ''As to the misconduct of the district attorney, there was no objection made nor exception taken and it cannot be reviewed.'' This rule is established by a legion of authorities, many of which are noted in 7 McKinney's Digest, section 1092 et seq. The reason for it is stated in *People* v. *Stein*, 23 Cal. App. 108 [137 Pac. 271] at p. 118 as follows: ''Over and over again, the appellate courts of this state have held that objectionable

remarks by the district attorney in a criminal case will not be reviewed or considered unless they have been objected to at the time they were made so that the trial court may be accorded an opportunity to counteract, if it can thus be done, their effect upon the jury." See also *People* v. *Kizer*, 22 Cal. App. 10 [133 Pac. 516, 521, 134 Pac. 346] at p. 20. In the latter case the court points out that "It is not, however, in every case that a reviewing court will restrict its examination to cases where objections are made. There are such flagrant violations of the rights of defendants that an admonition by the court, after objection, may not remove the prejudicial impression irresistibly made upon the minds of the jury by such unwarranted comment." We have given careful consideration to each and every charge of misconduct, itemized by this appellant, whether objected to or not, and find that there was no flagrant or any violation of his rights. He had the good fortune to be defended by attorneys, always on the alert to protect him from any possible invasion or disregard of his rights, and all objections interposed in his behalf as the case proceeded were promptly, and in our opinion, fairly ruled upon. And so it was, in regard to the closing argument. It must be remembered that for three full days the cause of the defendant had been presented to the jury by attorneys skilled in logic, rhetoric and oratory but no record of that presentation is before us. It is clear, however, that certain portions of the argument by the people's representative, which appellant's attorneys now find objectionable, were directed to matters discussed by them in their arguments. If such comment were before us it might be that the prosecutor's answer would seem mild indeed, but regardless of that, and studying each instance of alleged misconduct in the light of authorities cited by counsel for the appellant and for the people, we do not feel that this appellant suffered any prejudice to his rights. The remarks of Mr. Justice Burnett in *People* v. *Burke*, 18 Cal. App. 72 [122 Pac. 435] at pages 102 and 106, are peculiarly applicable to the situation under discussion and we pause to quote them: ". . . Manifestly, some allowance must be made for the zeal of attorneys and some confidence reposed in the intelligence and fairness of the jury, and it may be said, generally, that every statement of the district attorney criticised by appellant is less objectionable than what has been held by the Supreme Court to be in-

sufficient to warrant a reversal of the judgment. . . . The representative of the people, it is true, conducted the prosecution with a good deal of vigor. Without it, however, he could not hope to prevail against the alert, aggressive and able counsel for appellant who stubbornly contested every inch of the way. . . . In a word, appellant was fairly tried and justly convicted. The record is unusually free from error . . . we are convinced that no appellate court would be justified in interfering with the judgment of the trial court.''

As to the charges of misconduct in this case we agree with counsel for respondent when he says: ''In many of the instances here claimed to be misconduct, the record shows absolute silence by defense counsel at the time. In others an assignment was made and denied because the conduct was not misconduct. In others the assignment was recognized and the jury properly instructed. Absolutely no showing is made that in the instances where no objection was made an assignment would 'have been futile'.'' Nor was appellant in any way prejudiced by the court's rulings upon points of evidence or generally in the conduct of his trial. If, notwithstanding our opinion as hereinbefore expressed, any error has crept into this case, the judgments should stand, nevertheless, under section 4½ of article VI of the Constitution of California, since no miscarriage of justice has resulted. The fact that the same jury which convicted appellant upon six counts involving the Trews acquitted him on four others in which they were involved, is an indication that the members understood the instructions of the court, bearing upon the presumption of innocence and the requirement of proof beyond reasonable doubt. Their ability to distinguish between the merits of the different counts from a legal point of view satisfies us that they were sensible and reasonable individuals. As such they would have been justified in concluding that Mrs. Trew's injuries did not warrant an honest claim for more than $200 or $300, an estimate of their value which she once attributed to appellant. The evidence showed that on this claim he secured a settlement, within a few months, in the sum of $6,000. The participation of the Trews in that dishonest transaction cannot be excused, but they were not on trial before this jury, while the appellant was. In fact, he was the principal actor, and the jurors by their verdicts, convicting him of soliciting and suborning perjury in connection with the claim and the investigation concerning it, demonstrated their belief that

his was the master mind which conceived and carried out the fraud.

The judgments are each and all affirmed. The order of the trial court denying a new trial upon any of the counts is also affirmed.

York, P. J., and Doran, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 10, 1942. Carter, J., voted for a hearing.